## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Sean Todd Roseland, | ) | |
| | ) | |
| | ) | FILED: JUN 6, 2008 |
| Plaintiff, | ) | Case No. 08CV3275 |
| | ) | JUDGE DOW |
| v. | ) | MAGISTRATE JUDGE VALDEZ |
| | ) | RCC |
| NORTHERN TRUST CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Defendant, Northern Trust Bank, ("Defendant"), issued a bank ATM card for Sean Todd Roseland's, ("Plaintiff"), bank account and then, ("in contravention of its own security protocols"), sent that ATM card along with the PIN number needed to access the Roseland's account without any restrictive delivery or additional security needed to activate or access the account.

When persons unknown intercepted the ATM card along with the PIN number for the card, Roseland's account was drained. Roseland made a dispute and submitted an affidavit and evidence as to the unauthorized transactions and Northern Trust Bank failed to in good faith credit his account in accordance with the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et. seq.*

Plaintiff brings this action against Northern Trust Bank for its violations of the Electronic Funds Transfer Act (the "Act") and 12 C.F.R. 205 *et seq.*, commonly known as Regulation E, which contains regulations promulgated by the Board of Governors of the Federal Reserve

conclusion could not reasonably have been drawn from the evidence available to Northern Trust at the time of its investigation.

Roseland brings this action against Northern Trust Corporation for its violations of the Electronic Funds Transfer Act (the "Act") and 12 C.F.R. 205, *et seq*., commonly known as Regulation E, which contains regulations promulgated by the Board of Governors of the Federal Reserve System to implement the Act (the Act and Regulation E shall hereinafter be collectively referred to as "EFTA").

### The Parties

1.      Roseland is an Illinois citizen and resides in this district.

2.      Northern Trust Corporation is a federal savings bank with its principal place of business in this district.

### Jurisdiction and Venue

3.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because this action is brought pursuant to the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq.*

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Northern Trust resides in this district and a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

### Statutory/Regulatory Authority

### EFTA

5.      The Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq*. ("EFTA"), and its implementing Regulation E, 12 C.F.R. § 205.1, *et seq.*

2

## Facts Related To Roseland

6.      On December 26, 2007, Roseland notified his banker, Vicki Shields, about an unauthorized transaction on his account that posted from Travelocity in the amount of $298.80. This transaction was processed using his Visa debit card account, ending in 6731 and was made without his authorization.

7.      Roseland filed an affidavit with Vicki Shields, and was told that he would receive a provisional credit to his account while the investigation was pending, within ten days.

8.      Roseland was on his way to Chicago O'Hare airport when he received a telephone call from Vicki Shields and another representative from Northern Trust's ATM dispute department asking for more information about the charge.

9.      Roseland was then informed that due to Visa regulations, once a dispute is opened, the card in question must be shut down for security reasons, and that Northern Trust would have to issue a new card.

10.      Roseland informed Vicki and the ATM representative that Roseland was en route to the airport, on his way to Florida, and that Roseland would not be back in Chicago for almost a month. Vicki Shields and Northern Trust's ATM representative told Plaintiff they would have the new ATM card sent to the address where he was staying in Florida.

11.      As another option, Roseland requested that the replacement card be sent to the Northern Trust branch in Ft. Lauderdale, FL, which was the city where Roseland was staying.

12.      Vicki and the ATM representative stated that this was impossible and that the card must be sent to the address where he was staying. Vicki Shields and the ATM representative indicated it would be sent via Federal Express.

3

13.     Roseland informed Vicki and the ATM representative that he would be in and out of his mother's townhouse, located in Ft. Lauderdale, Florida. In turn, Vicki Shields and the ATM representative told him that the replacement card would be sent to that address. This was the end of this conversation.

14.     Between December 26, 2007 and January 1, 2008, Roseland did not receive the card at his mother's townhouse, located in Ft. Lauderdale, Florida.

15.     Roseland went the Northern Trust branch in Ft. Lauderdale on January 2, 2008. While at the bank on January 2, 2008, Roseland made a deposit in the amount of $6,142.72.

16.     While at the bank on January 2, 2008, Roseland spoke to the teller where he made the deposit and asked the teller about his replacement card. As Roseland had not received the card he inquired as whether the new card had in fact been sent to the address of his mother's townhouse in Florida or alternatively, if it had been sent to his home address in Chicago.

17.     The teller informed him that the only address listed in the bank's records on the account was the Chicago account, so the card was probably sent there.

18.     As Roseland's mail in Chicago was on hold and he had other means of credit, Roseland did not inquire further.

19.     Roseland returned home to Chicago on January 17, 2008.

20.     Roseland picked up his mail on January 21, 2008, and there was nothing from the Northern Trust.

21.     On or about January 23, 2008, Roseland contacted the receiving room in his building to see if there were any FedEx or UPS deliveries made while he was out of town. The normal clerk was out, and the temp told Roseland that he should check back in the next couple days since the normal clerk was the only one who would know.

4

22.    Having now exhausted his search in the logical places where the replacement card could have been sent and not having found the replacement card, on Friday January 25, 2008, Roseland went to the Oak Street branch of Northern Trust.

23.    On that day, Roseland made a deposit of $4,000.00 at the Oak Street branch of Northern Trust at around 5:00 p.m.  At that time, Roseland also made an inquiry as to the account balance.

24.    The teller provided Roseland with a balance statement, which showed a balance of $4,070.89 after the $4,000 deposit.

25.    In response, Roseland told the teller that the balance couldn't be right.  The teller then printed out the account history which showed numerous ATM withdrawals made in Florida, beginning on December 29, 2007, that drained Roseland's account and that were not made by him.

26.    Roseland immediately disputed the unauthorized withdrawals with the teller stating that the withdrawals were not his and not made with his authority.

27.    Roseland was then referred to Sue Ann Selle, one of the bankers.

28.    Sue Ann Selle pulled Roseland's account information and she said that it showed transactions that took place from December 29, 2007 up until January 25, 2008, and which drained his account.  Roseland again disputed the erroneous withdrawals and added that the transactions could not have been made by him as they were made in Florida when he was in Chicago.

29.    Ms. Selle then informed Roseland that the bank's information showed that the replacement card and the pin number needed to access the ATM card had been delivered to Roseland's mother's address on December 29, 2007 at the same time.

30.     Roseland asked Ms. Selle if the bank had a signature for the delivery of the ATM card and the PIN number to that card.

31.     Ms. Selle informed Roseland that the bank did not have a signature for the delivery.

32.     Ms. Selle informed Roseland that the only information the bank had on the delivery of the ATM card and PIN number was that the package was shown as being "delivered." This was false in that, on information and belief, Northern Trust had in their possession information showing the ATM card was merely left at the door of the address to which it was sent and not delivered to a person.

33.     Thus, Northern Trust sent Roseland's ATM card and PIN number allowing for access to that ATM card together and did not take any measures whatsoever to ensure that the packages were received by Roseland personally, or to even record who such package was delivered to, even though it knew that it was not sending the packages to Roseland's home address.

34.     The information in Northern Trust's investigation file shows that the packages containing Roseland's ATM card and PIN number were not delivered to a live human being for signature, but were: "left at front door" at 11:57 a.m. after first having been attempted to be delivered at 9:57 a.m.

35.     Roseland asked about Northern Trust's security procedures for sending replacement cards without requiring Plaintiff to personally activate the card by telephone or in person, and using a password or some other personal identifying information to activate the card. Northern Trust's reason for having no security procedures whatsoever was that it was convenient to send Roseland a "live" card and the PIN number needed to activate it at the same time.

6

36.    Adding to the stress of having his account drained of all his money, (in excess of $13,000.00), due to Northern Trust's failure to protect his account, Roseland received a telephone call from Janice Malmquist in Northern Trust's fraud department who interrogated him about where he had been staying in Florida and who resided there. She also asked Roseland for personal pictures of his family to rule them out as persons suspected of using his ATM card. Although insulted and outraged at the implication of her request, Roseland complied.

37.    On January 28, 2008, Roseland filled out another affidavit disputing the withdrawals and charges on his account with the bank and provided it with a written statement and the police report he had filed on the matter.

38.    When Northern Trust failed to rectify the problem or indicate what would happen, Roseland called his personal banker, Vicki Shields on February 11, 2008 for an update on his dispute and to find out when his account would be credited.

39.    Vicki Shields told Roseland that his dispute was rejected and that Northern Trust had already sent him a letter describing the circumstances on February 7, 2008. As Roseland had not received the letter, he asked her to explain why his dispute was rejected, but she refused. When Roseland pressed the issue, he was transferred to Janice Malmquist.

40.    Ms. Malmquist also refused to explain the reasons that his dispute was rejected and told him: "It's all spelled out in the letter. You should get it in the next day or two." As she would not explain what happened he asked to be transferred to someone who would.

41.    Roseland was then transferred to David Villapondo, manager of the ATM dispute department. However, Mr. Villapondo was no different. He also refused to provide Roseland with an explanation, and referred Roseland to the letter that he never received. Roseland asked

Mr. Villapondo to fax a copy of the alleged letter. Mr. Villapondo claimed that he didn't have a copy, but that he would send it.

42.     Sometime after February 11, 2008, Roseland finally received a copy of Northern Trust's letter denying his dispute because the card was delivered to the address where Roseland was staying in Florida, and that someone at the home had authorization to use the card. The letter further indicated that Roseland could request that Northern Trust provide him with documentation relating to its review of the matter.

43.     Northern Trust's letter instructed Roseland to call Vicki Shields, the person that previously refused to discuss his dispute, for further explanation.

44.     Roseland then called Vicki Shields to contest the determination. However, she informed him that she was "out of the loop on this matter and had not received any additional information."

45.     Roseland also called Ms. Malmquist and Mr. Villapondo, leaving voicemail messages that have not been responded to.

46.     Roseland again called Vicki Shields and told her that he wanted information regarding Northern Trust's rejection of his dispute, and all she could say was that the investigation was ongoing, but as of now, Northern Trust felt that the transactions were valid.

47.     Roseland responded to the Northern Trust's February 13, 2008 letter, asking for copies of the documentation that was used in making its determination. In response, Northern Trust sent Roseland: 1) verification of his mother's address; and 2) copies of the delivery logs that the packages were delivered.

48.     Eventually, Roseland was able to get in touch with Ms. Malmquist, who reviewed the pictures of Roseland's family to find out if they were shown on any of the ATM surveillance tapes from the machines where the disputed ATM transactions took place.

49.     On February 25, 2008, Ms. Malmquist informed Plaintiff that Northern Trust had no evidence that any of Roseland's family members appeared in any footage from the time when the transactions took place.  Ms. Malmquist further informed Plaintiff that she had no other information, that her part in the matter was done, and it was now out of her hands. Roseland was told to contact Vicki Shields if he had any more questions.

50.     Roseland then called Vicki Shields on February 25, 2008, and was told that even though: 1) the bank had no signature for the receipt of the ATM card; and 2) there was no footage of the Plaintiff or any of the Plaintiff's family members having used the ATM at issue for the disputed transactions, that the bank had determined that the transactions were valid because the card was sent to an address supplied by Plaintiff.

## COUNT I
## VIOLATION OF EFTA AND REGULATION E

51.     Plaintiff incorporate herein by reference paragraphs 1-50.

52.     Plaintiff's ATM card is governed by the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq.*

53.     The stated purpose of the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et. seq.* is as follows:

> It is the purpose of this subchapter to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems. The primary objective of this subchapter, however, is the provision of individual consumer rights. 15 U.S.C. § 1693(b)

(Emphasis added).

54.    Section 15 U.S.C. § 1693f(a) of the Act provides that a consumer may dispute, either orally or in writing, errors on his or her account within 60 days of the documentation of such error having been transmitted to the consumer.

55.    Under 15 U.S.C. § 1693f(f), an error consists of, among other things, "an unauthorized electronic fund transfer."

56.    In this case, the error was a series of unauthorized electronic fund transfers caused by Northern Trust where Northern Trust sent Roseland's ATM card and the PIN number together, without providing adequate security measures for the ATM card, including any requirement that Roseland sign for the card or personally activate the card. As a result, some unknown person stole Roseland's ATM card and PIN number, and drained the funds from Roseland's account.

57.    The unauthorized electronic fund transfers of which Roseland complained and disputed to Northern Trust constitute "errors" under EFTA. The fact that Roseland never made these charges is evidenced by, among other things, that he never received the card, he never activated the card, and that the withdrawals occurred from sites in Florida when Roseland was in Chicago, Illinois.

58.    On January 25, 2008, Roseland disputed the unauthorized transactions to Northern Trust, both orally and in writing.

59.    In response to the dispute, according to Section 15 U.S.C. § 1693f(a)(3), "the financial institution shall investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days."

10

60.    On information and belief, Northern Trust did not mail the results of its investigation under 15 U.S.C. § 1693f(a)(3) until after February 9, 2008.

61.    Upon completing its investigation and finding an error, Section 15 U.S.C. § 1693f(b) of the Act requires that the financial institution correct the error subject to Section 15 U.S.C. § 1693g, including crediting interest where applicable. See 15 U.S.C. § 1693f(b):

> **(b) Correction of error; interest**
> If the financial institution determines that an error did occur, it shall promptly, but in no event more than one business day after such determination, correct the error, subject to section 1693g of this title, including the crediting of interest where applicable.

62.    Northern Trust did not correct the error in accordance with Section 15 U.S.C. § 1693f(b).

63.    Under Section 15 U.S.C. § 1693f(c) of the Act, Northern Trust could have provisionally recredited the Roseland's account as set forth below:

> **(c) Provisional recredit of consumer's account**
> If a financial institution receives notice of an error in the manner and within the time period specified in subsection (a) of this section, it may, in lieu of the requirements of subsections (a) and (b) of this section, within ten business days after receiving such notice provisionally recredit the consumer's account for the amount alleged to be in error, subject to section 1693g of this title, including interest where applicable, pending the conclusion of its investigation and its determination of whether an error has occurred. Such investigation shall be concluded not later than forty-five days after receipt of notice of the error. During the pendency of the investigation, the consumer shall have full use of the funds provisionally recredited.

64.    Northern Trust did not provisionally recredit the Plaintiff's account in accordance with Section 15 U.S.C. § 1693f(c) of the Act.

65.    Northern Trust did not make a good faith investigation of the alleged errors to Roseland's account.

11

66.    Roseland is entitled to treble damages as: 1) Northern Trust did not provisionally recredit Roseland's account within the ten-day period specified in 15 U.S.C. § 1693f(c); and 2) Northern Trust did not make a good faith investigation of the errors on Roseland's account. *See* 15 U.S.C. § 1693f(e).

67.    Northern Trust did not have a reasonable basis for believing Roseland's account was not in error.

68.    Roseland is entitled to treble damages as: 1) Northern Trust did not provisionally recredit Roseland's account within the ten-day period specified in 15 U.S.C. § 1693f(c); and 2) Northern Trust did not have a reasonable basis for believing Roseland's account was without error. *See* 15 U.S.C. § 1693f(e).

69.    Northern Trust knowingly and willfully concluded that the Roseland's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to Northern Trust at the time of its investigation.  Roseland is therefore entitled to treble damages. *See* 15 U.S.C. § 1693f(e).

70.    As a result of Northern Trust's actions and inactions as set forth above, Plaintiff is entitled to damages under Section 15 U.S.C. § 1693m(a) for his actual damages, his statutory damages up to $1,000.00, treble damages, and his reasonable attorneys fees and costs.

WHEREFORE, Plaintiff requests that this Court enter judgment in their favor and against Northern Trust Corporation as follows:

A.    Awarding Plaintiff actual, statutory, and treble damages as set forth in the EFTA and Regulation E;

B.    Awarding Plaintiff attorneys' fees and costs of suit; and

C.    Awarding Plaintiff such other relief as this Court deems proper.

**Plaintiff demands a trial by jury**

By:     /s/  Lance A. Raphael
         Lance A. Raphael, One of Plaintiff's Attorneys

Dated: June 5, 2008

Lance A. Raphael
Stacy M. Bardo
Allison Krumhorn
The Consumer Advocacy Center, P.C.
180 W. Washington St., Ste. 700
Chicago, IL 60602
312.782.5808